UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Eric M. Lamarche, Sr.,
    Plaintiff

    v.                                        Civil No. 04-cv-69-SM
                                              Opinion No. 2009 DNH 078
Corrections Officer Mark Jordan
and Corporal Brett Morrison,
    Defendants


**O R D E R**

At all times relevant to this suit plaintiff, Eric Lamarche, was an inmate at the New Hampshire State Prison. On March 22, 2002, he was assaulted by Peter Rivera – a fellow inmate. In the sole remaining count of his complaint, Lamarche asserts that by placing him alone in a cell with Rivera, defendants failed to protect him from a foreseeable assault. And, says Lamarche, by doing so, defendants violated his Eighth Amendment rights. Defendants move for summary judgment, asserting that the record fails to support any plausible inference that they were deliberately indifferent to (or even aware of) the threat posed to Lamarche by the other inmate. Lamarche objects.


**Standard of Review**

I.  Summary Judgment.

When ruling on a party's motion for summary judgment, the court must "view the entire record in the light most hospitable

to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Intern'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

Nevertheless, if the non-moving party's "evidence is merely colorable, or is not significantly probative," no genuine dispute as to a material fact has been proved, and "summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted). The key, then, to defeating a properly supported motion for summary judgment is the non-movant's ability to support his or her claims concerning disputed material facts with evidence that conflicts with that proffered by the moving party. See generally Fed. R. Civ. P. 56(e). It naturally follows that while a reviewing court must take into account all properly documented facts, it may ignore bald assertions, unsupported conclusions, and mere speculation, see

Serapion v. Martinez, 119 F.3d 982, 987 (1st Cir. 1997), as well as those allegations "which have since been conclusively contradicted by [the non-moving party's] concessions or otherwise." Chongris v. Board of Appeals, 811 F.2d 36, 37 (1st Cir. 1987).

**Background**

Viewed in the light most favorable to Lamarche, the relevant facts are as follows. In April of 2002, Lamarche informed prison authorities that he had been threatened by another inmate (Edward Dunshee) and feared for his life. He was immediately placed into "pending administrative review" status, while prison authorities conducted an investigation into the reported threat. Accordingly, Lamarche was moved from the general inmate population into the prison's secure housing unit ("SHU"). As part of that transfer, Lamarche was asked to identify any known enemies within the prison. Aside from Dunshee, Lamarche did not identify any inmates he believed posed a threat to him.

In late April, the prison's Protection Review Board denied Lamarche's request for protective custody. Accordingly, on May 6, 2002, Lamarche's status was changed from "pending administrative review" to "awaiting bed space," while prison authorities determined where (and when) he could be moved back

into the general inmate population.  Lamarche remained in SHU while that transfer back into general population was arranged.  It is, however, unclear whether the Board's decision and/or Lamarche's change in status was actually communicated to either Lamarche or the corrections officers working within SHU.  As Lamarche points out, from the date of his arrival in SHU until the day on which he was assaulted by Rivera, the "Special Housing Unit Roster" consistently listed him as either "SM-PC" (i.e., single movement, protective custody) or simply "single movement."  The court, then, will assume that from late April of 2002 until the date on which Lamarche was assaulted (May 29, 2002), defendants believed (albeit erroneously) that Lamarche was still classified in either "pending administrative review" status or "protective custody/single movement" status.

Parenthetically, the court notes that the prison does not have a written policy regarding "single movement" status and Lamarche does not describe what he understood that status to mean.  According to defendant Mark Jordan, whose testimony is unrebutted:

> This term has meant different thing[s] at different times in SHU. . . .  Single movement is not necessarily related to protective custody status, and in fact was frequently used to control inmates that themselves had a history of violent or antisocial behavior.  The fact that Mr. Lamarche had requested that he be treated as single movement, and that we were allowing him to be

4

>  treated that way, does not mean that we violated any
>  policy by putting him in the shaving room to shave with
>  the trustee inmate who was not on Lamarche's threat
>  list.

Exhibit A to defendants' reply memorandum (document no. 80), affidavit of Mark Jordan, at para. 10.  The prison's written policy regarding protective custody is set forth in New Hampshire Department of Corrections Policy and Procedure Directive ("PPD") 5.43.  Exhibit B-5 to defendants' memorandum (document no. 76).  Defendant Jordan summarized that PPD as follows:

>  Consistent with PPD 5.43, . . . an inmate that provided
>  sufficient information to start the review process for
>  protective custody would be placed in pending
>  administrative review (PAR) status.  If they were
>  housed in a building other than SHU at the prison when
>  they made the request they would frequently, although
>  not always, be transferred to SHU on PAR.  An
>  Administrative Review Board meets to determine whether
>  the inmate's request for protective custody will be
>  granted.  If the inmate's request for protective
>  custody is not granted, then they would be returned to
>  the custody level and housing unit recommended by the
>  Administrative Review Board as soon as bed space became
>  available.  This would not always happen immediately.
>
>  Even if an inmate is granted protective custody, they
>  are not segregated from all other inmates.  They are
>  only kept segregated from those inmates that are the
>  source of the threat.  To my knowledge in May of 2002,
>  Mr. Lamarche had not complained about Peter Rivera, but
>  had complained about another inmate by the name of
>  Edward Dunshee.

Exhibit B to defendants' memorandum, affidavit of Mark Jordan, at paras. 4-5.  Again, Lamarche does not rebut Jordan's description of the policy or the manner in which it was implemented.

5

In May of 2002, inmate Rivera was a SHU trustee and the unit's barber. He was responsible for giving haircuts to other inmates in SHU (including those who were in SHU either pending administrative review or in protective custody) and he was in charge of the trimmers inmates used to shave their facial hair. Id. at paras. 8-9. Rivera had held that position for several months and, in that capacity, would have interacted with any of the protective custody and/or PAR inmates housed in SHU. Id. at para. 10. According to Jordan, Rivera never displayed a bad or threatening attitude toward any protective custody inmates in the months prior to his assault upon Lamarche. Id. at para. 11.

At some point in early March, Lamarche says defendants informed him that he had to shave his facial hair. He objected, saying he was in protective custody and did not want to leave his cell.

> I told them I don't want to go in there, you know, and they stuck me in there anyways. And I told 'em, you know, I was on PC status, single cell, single movement. I didn't want to go in there, you know.

Exhibit A to defendants' memorandum, Lamarche deposition at page 24. Importantly, Lamarche does not claim to have informed defendants that he believed Rivera posed a threat to him; he merely told them that he did not want to leave his cell and reminded them that he was in protective custody.

Despite his protestations, Lamarche says defendants insisted that he shave and took him to the barber room so he might do so. When Lamarche arrived at the barber room, he complained to defendants that, based on his PC status, he did not wish to remain in the room alone with Rivera. Rivera overheard that conversation and, needless to say, learned that Lamarche was in protective custody. Defendants removed Lamarche's handcuffs, exited the room, and locked the door. According to Lamarche, he told Rivera, "Look, I don't want no problems." Lamarche deposition at 26. Rivera replied by making a demeaning comment about Lamarche being in protective custody. Nevertheless, Lamarche was able to shave without incident, after which defendants returned him to his cell. As he was being escorted back to his cell, Lamarche says he told defendants, "That guy's in there. You know, you guys put me in with a trustee, a general population inmate, you know. And, you know, [Rivera's] like, 'You PC, you PC,' you know. And I said, you know, 'You guys can't do that,' you know. 'It's wrong.'" Lamarche deposition at 30.

Subsequently, on May 29, 2002, defendants again informed Lamarche that he needed to shave. Again, however, he protested.

> And I said, "I don't want to go shave." They said, "Look, cuff up. You're gonna go shave." And I said, "I don't want to." And they said, "Look, you have to.

7

>      It's no ifs, ands, or buts."  And I said, "Look, I'm
>      protective custody, single cell, single – how many
>      times do I have to tell you this?"  And they said, "We
>      don't care.  You're gonna go shave.  You have to
>      shave."  And I said, "Well, if I have to, I have to.
>      You know, it's against – I don't want to, but if you
>      guys are saying I have to, you know, what can I do
>      about it?"  So I cuffed up and went over there.

Lamarche deposition at 32.  As before, although Lamarche made it clear that he did not want to shave, leave his cell, or be left alone with Rivera, he did not tell defendants that Rivera had ever threatened him or that he had any particular reason to fear Rivera.  Instead, the statements he claims to have made to defendants were entirely consistent with a desire to remain in his cell and not have contact with <u>any</u> other inmates at the prison.

As they had on the prior occasion, defendants left Lamarche in the barber room with Rivera.  According to Lamarche, he told Rivera, "Hey, I'm just gonna shave.  I'm out of here."  <u>Id</u>. at 33.  Rivera responded by again making condescending statements about Lamarche's PC status.  Lamarche then asked Rivera if he could have one of the electric trimmers and began shaving.  Then, as Lamarche's back was at least partially turned to Rivera, Rivera attacked and severely beat him.  Lamarche was taken to the local hospital for treatment and subsequently required

reconstructive surgery on portions of his face. This suit followed.

**Discussion**

I. <u>Failure to Protect an Inmate from Assault</u>.

As the Supreme Court has observed, the "Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones." <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994) (citation and internal punctuation omitted). The Constitution does impose on prison officials the obligation to "protect prisoners from violence at the hands of other prisoners." <u>Id</u>. at 833 (citation omitted). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." <u>Id</u>. at 834. Rather, liability attaches only when two requirements are met:

> First, the deprivation alleged must be, objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities. For a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.
>
> The second requirement follows from the principle that only the unnecessary and wanton infliction of pain implicates the Eighth Amendment. To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind. In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety.

9

Id. at 834 (citations, footnote, and internal punctuation omitted).

Under the second part of that two-part test, Lamarche must demonstrate that the defendants were more than merely negligent when they left him alone in the cell with Rivera. See, e.g., Estelle v. Gamble, 429 U.S. 97, 106 (1976). In other words, a prison official "cannot be found liable . . . for [failing to protect an inmate from an assault] unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. The test is, then, a subjective one. And, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact." Id. at 842.

While a corrections officer's alleged deliberate indifference to a serious risk of substantial harm presents a question of fact, that does not necessarily mean that a defendant can never prevail on a motion for summary judgment. For example, a defendant might demonstrate that, based upon the alleged assailant's prior exemplary behavior within the correctional facility, no reasonable trier of fact could conclude that the

defendant should have known that the assailant posed an "excessive risk to inmate health or safety." Farmer, 511 U.S. at 837.

So, to avoid summary judgment on his "failure to protect" claim, Lamarche must point to facts from which the defendants might reasonably have inferred that Rivera posed a substantial threat to Lamarche's safety, thereby warranting some preventative measures on the part of prison authorities. Additionally, he must demonstrate that defendants consciously disregarded, or were deliberately indifferent to, that risk. Simply positing that Lamarche filed a request for protective custody status prior to the assault is not, standing alone, sufficient; such a request does not compel the conclusion that Lamarche should have been placed into protective custody, nor does it necessarily suggest that corrections officers recognized, but were indifferent to, the threat Rivera posed to Lamarche. This is particularly true in this case, since the only inmate Lamarche ever identified as a potential threat to him was Dunshee.

II. Plaintiff's Evidence.

In support of his claim, Lamarche suggests that corrections officers plainly understood that Rivera was a violent inmate and,

as a result, knew (or should have known) that he posed a significant threat to Lamarche. But, the evidence on which Lamarche relies fails to support that assertion. That point is well addressed in defendants' reply memorandum (document no. 80) and need not be discussed in detail. It is sufficient to note a few salient facts.

First, Rivera was <u>not</u> in SHU because he had engaged in any violent or threatening conduct. Rather, he was in SHU because he had been involved in an inappropriate relationship with a prison nurse. When their romance was discovered, the nurse resigned and Rivera was disciplined by being sent to SHU. Second, the evidence upon which Lamarche relies in suggesting that Rivera was a violent and dangerous inmate is, at best, stale. <u>See, e.g.</u>, Defendants' reply memorandum (document no. 80) at 3 ("Mr. Rivera has been incarcerated at NHSP since 1995. The only physical altercation Rivera had been involved in appears to be a fight with an inmate by the name of Todd Peters in 1995, shortly after he arrived, almost <u>seven years</u> prior to [his assault upon Lamarche in] May, 2002.") (emphasis supplied)(citations omitted). <u>See generally</u> <u>Burrell v. Hampshire County</u>, 307 F.3d 1, 9 (1st Cir. 2002) (noting, in a similar case, that "it had been nearly nine months since Allen had been disciplined for violent

behavior" – a factor suggesting that prison authorities had little reason to suspect that he would assault the plaintiff).

And, finally, according to the uncontroverted evidence of record, Rivera had no documented problems with any other inmates (including those in protective custody or PAR status) during the several months during which he acted as the SHU trustee barber. In short, Lamarche has failed to point to sufficient evidence to permit a rational trier of fact to conclude that defendants knew, yet were deliberately indifferent to, the fact that Rivera posed a general threat of violence and, therefore, should not be left unattended with any other inmates. Nor, necessarily, is there any evidence to suggest that defendants knew, yet were deliberately indifferent to, the fact that Rivera posed a substantial threat to Lamarche in particular.

The essence of Lamarche's claim against defendants is that, on the day of the assault, they believed (erroneously) that he was still in protective custody and, therefore, owed him a constitutional obligation not to leave him alone with any other inmate including, of course, Rivera.

> The most important evidence Lamarche can present of defendants' duty to not leave Lamarche alone with C-5 inmate Rivera, is that on all the daily "Special Housing Unit Roster" sheets which list every inmate in SHU on a chart indicating their cell placement and

13

> their particular restrictions, Lamarche is listed as "SM-PC" (or single movement-protective custody) <u>every day</u> from May 4, 2002, until the last roster published before the May 29 assault.
>
> Therefore, every day that defendants (and other SHU staff) looked to see where Lamarche lived and what restrictions/protections he carried, they saw that Lamarche was "SM-PC."  SM-PC simply means that defendants could not leave Lamarche alone with Rivera.

Plaintiff's memorandum at paras. 10-11 (emphasis in original). The court disagrees.

Well prior to the assault, Lamarche's request for protective custody had been rejected by prison officials and he remained in SHU simply because those officials were waiting for an available bed/cell in the general inmate population.  So, despite the information contained on the SHU inmate roster sheets, Lamarche was not in protective custody and he did not have a constitutionally protected right to have defendants treat him in accordance with inaccurate information.  In other words, he cannot base his Eighth Amendment claim on the fact that defendants failed to treat him as a protective custody inmate when, in fact, he was not.

Moreover, even if Lamarche was entitled to be treated as a protective custody inmate, that would not compel the conclusion that defendants violated his constitutionally protected rights by

14

leaving him unattended with Rivera. As noted above, an inmate in protective custody is not isolated from all other inmates at the prison. Rather, to the extent possible, prison authorities attempt to isolate him from those inmates specifically identified as potential threats. And, as Lamarche concedes, the only inmate he identified as posing a potential threat to him was Dunshee. Lamarche never told any prison authority that he had reason to fear Rivera, nor does the record support the inference that defendants knew (or should have known) that Rivera posed a substantial threat to Lamarche. As the court of appeals has observed, "[p]rison officials cannot be indifferent, of course, if they are unaware of the risk." Burrell, 307 F.3d at 8.

## Conclusion

Having carefully reviewed the record evidence, as well as the legal arguments advanced by the parties, the court concludes that there is simply insufficient evidence in the record for a jury to plausibly conclude that defendants knew of, yet consciously disregarded, an excessive risk to Lamarche's safety posed by Rivera. Consequently, defendants are entitled to judgment as a matter of law as to Lamarche's Eighth Amendment claim that they were deliberately indifferent to his safety/security needs.

For the foregoing reasons, as well as those set forth in defendants' memoranda, defendants' motion for summary judgment (document no. 76) is granted.  The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

June 10, 2009

cc:  Michael J. Sheehan, Esq.
     Nancy J. Smith, Esq.